1  **WO**

2  NOT FOR PUBLICATION

3

4

5

6  IN THE UNITED STATES DISTRICT COURT

7  FOR THE DISTRICT OF ARIZONA

8

9  N'GENUITY ENTERPRISES CO., an) No. 09-CV-00385-PHX-GMS
   Arizona corporation,                )
10                                       )  **ORDER**
              Plaintiff,                )
11                                       )
   vs.                                   )
12                                       )
                                         )
13  PIERRE FOODS, INC., a foreign)
   corporation; TIMOTHY DENNING;)
14  NORB WOODHAMS, SR.; NORB)
   WOODHAMS, JR.,                       )
15                                       )
              Defendants.               )
16                                       )
   _____)
17

18

19      Pending before the Court is Defendants' Motion to Dismiss.  (Dkt. # 18.)  For the

20  following reasons, the Court grants the motion in part and denies the motion in part.[1]

21                              **BACKGROUND**

22      This case is brought by Plaintiff N'Genuity Enterprises Company, an Arizona

23  corporation, which is a manufacturer and wholesaler of food products.  N'Genuity sells these

24  products to a number of "prime vendors," who then market the products for sale to

25

26  _____

27  [1]Plaintiff has requested oral argument.  That request is denied because the parties have
   thoroughly discussed the law and the evidence, and oral argument will not aid the Court's
28  decision.  *See Lake at Las Vegas Investors Group, Inc. v. Pac. Malibu Dev.*, 933 F.2d 724,
   729 (9th Cir. 1991).

consumers. Some of these prime vendors market the products for sale at American military facilities. To satisfy the orders of these prime vendors, N'Genuity partners with other manufacturers. One such manufacturing partner was Zartic, Inc., which contracted with N'Genuity in 2003 to produce and supply N'Genuity's chicken wing products. These chicken wing products were eventually sold to prime vendors to be marketed at military facilities.

In 2007, N'Genuity was contacted by Defendant Pierre Foods, Inc. Headquartered in Ohio, Pierre Foods is also a manufacturer and wholesaler of food products. Pierre Foods employs Defendants Timothy Denning, Norb Woodhams Sr., and Norb Woodhams Jr. ("the Individual Defendants"), all of whom are residents of Indiana or Ohio. When it approached N'Genuity, Pierre Foods allegedly represented that it was the successor-in-interest to Zartic, which N'Genuity took to mean that, while ownership of Zartic may have changed hands, there were no changes in operational personnel, manufacturing facilities, and other production procedures. N'Genuity now alleges that this was a misrepresentation, and that Pierre Foods simply purchased some of Zartic's assets in order to capitalize on its name.

Apparently unsatisfied with Pierre Foods' operations through the first half of 2007, N'Genuity began to suggest that it would discontinue the relationship. At that point, Denning allegedly "began making statements to the effect that Pierre Foods would go around N'Genuity and market and sell chicken wing products directly to the military." (Dkt. # 1 at 5.) To address those statements, N'Genuity and Pierre Foods arranged a conference call on May 25, 2007. In that call, Woodhams Sr. "personally assured N'Genuity that Pierre Foods would never go around N'Genuity and sell N'Genuity products directly to the military or any other customers of N'Genuity." (*Id.* at 6.) Woodhams Sr. is alleged to have made a subsequent call to N'Genuity in which he reiterated that Pierre Foods would not circumvent N'Genuity, acknowledged that doing so would violate Pierre Foods' agreements with N'Genuity, and stated that he was "embarrassed" that Pierre Foods had not been "following through on their commitments and obligations." (*Id.*) These assurances satisfied N'Genuity enough for it to continue the relationship with Pierre Foods.

In November of 2007, N'Genuity and Pierre Foods began to negotiate a new contract. Woodhams Jr. was part of Pierre Foods' negotiating team, and on a conference call to N'Genuity he "confirmed that Pierre Foods would provide a quality-assurance and customer-service representative dedicated to representing N'Genuity's interest," with N'Genuity writing the job description for this position. (*Id.* at 7.) N'Genuity did so, and Woodhams Jr. confirmed that Pierre Foods would provide a representative according to its criteria.

Negotiations for a new contract continued through much of 2008. N'Genuity contends that Pierre Foods did not act in good faith during these negotiations, altering draft agreements and, through Woodhams Jr. and others, demanding that N'Genuity sign the agreements. According to N'Genuity, the negotiations were merely a ruse to provide cover for Pierre Foods to circumvent N'Genuity and market products directly to the military. Eventually, Pierre Foods agreed to sign an indemnification agreement covering all unresolved issues and questions regarding the draft agreement. It also promised to remedy N'Genuity's complaints about how its business was run.

Given these assurances, on August 27, 2008, N'Genuity signed an agreement ("the Supplier Agreement") providing for Pierre Foods' continuing manufacture of the chicken wing products. On the same date, the parties allegedly executed a Confidentiality and Nondisclosure Agreement. Around this time, N'Genuity also committed to placing orders for all of Pierre Foods' existing inventory of the chicken wing products.

However, Pierre Foods allegedly failed to execute the indemnity agreement, failed to provide a quality assurance and customer service representative according to N'Genuity's criteria, and failed to remedy the many complaints about its operations that N'Genuity has made since 2007, including its failure to implement an effective inventory control system. Pierre Foods is also alleged to have improperly maintained an oversupply of the chicken wing products. Just before the Supplier Agreement was entered into, Woodhams Jr. informed N'Genuity that Pierre Foods maintained roughly 34,000 cases of chicken wing products, and in response N'Genuity said that it should maintain only 10,000 cases (because overstocked inventory loses shelf life). The Supplier Agreement memorialized that

N'Genuity was to inform Pierre Foods of the amount of inventory to maintain, and N'Genuity officially set this level at 10,000 cases of chicken wing products. Nevertheless, Pierre Foods allegedly continued to maintain substantially excessive inventory.

On November 11, 2008, N'Genuity emailed Pierre Foods (including Woodhams Jr.) about its alleged breaches, and Pierre Foods responded by suggesting that the two companies discontinue their relationship pending an agreement on how to dispose of the remaining inventory. N'Genuity agreed to work with Pierre Foods to sell the inventory, permitting it to process an order from Agility, one of the prime vendors. Within a few days of the shipment, Agility complained to N'Genuity about the quality of the chicken wing products it had received. N'Genuity then investigated the shipments made by Pierre Foods since entering the Supplier Agreement and allegedly discovered numerous violations, such as improper shipping practices and the shipment of "shelf-life deficient" product (product that has less than eighty-five percent of its shelf-life remaining). N'Genuity also discovered that Pierre Foods had lied about when its oldest inventory had been manufactured.

Based on its investigation, N'Genuity stopped placing orders with Pierre Foods. It attempted to contact Pierre Foods, including by attempting to contact Woodhams Jr., but N'Genuity's calls and records requests were ignored. N'Genuity asserts that in February of 2009 Pierre Foods began shipping its remaining inventory, all of which was shelf-life deficient, to the prime vendors. N'Genuity contends that these sales were unauthorized and damaged N'Genuity's business relationships.

N'Genuity also alleges that Pierre Foods, and specifically Defendant Denning, made defamatory statements about N'Genuity to undermine its business relationships and ultimately to permit Pierre Foods to market N'Genuity's products directly to the prime vendors. Specifically, Pierre Foods and Denning are alleged to have told various prime vendors, as well as the Army Center of Excellence, Subsistence ("ACES") (which approves products sold to military installations) that N'Genuity wrongfully refused to place orders with Pierre Foods. N'Genuity also alleges that Pierre Foods breached the Nondisclosure and

Confidentiality Agreement by permitting Denning to obtain information about the relationship between N'Genuity and Pierre Foods.

On February 25, 2009, N'Genuity filed the Complaint underlying this lawsuit. N'Genuity advances twelve claims:

(1) breach of contract;

(2) breach of the duty of good faith and fair dealing;

(3) fraudulent misrepresentation;

(4) fraudulent concealment and nondisclosure;

(5) fraudulent inducement;

(6) interference with existing contractual relationships;

(7) interference with prospective business relationships;

(8) unfair competition;

(9) defamation, libel, and slander;

(10) trade libel and slander;

(11) misappropriation of trade secrets and proprietary information; and

(12) a request for a declaratory judgment that N'Genuity performed all of its obligations under its contracts, that it did not breach or violate any obligations or duties to Pierre Foods, and that Pierre Foods is not entitled to sell any N'Genuity product.

The claims are asserted against all Defendants, except for claim one, which is asserted against Pierre Foods only. On April 10, 2009, Defendants filed the instant motion to dismiss. (Dkt. # 18.)

## DISCUSSION

## I.     The Individual Defendants

The Individual Defendants argue that they should be dismissed from this action because: (A) the Court lacks personal jurisdiction over them, and (B) even according to the Complaint, the Individual Defendants acted only on behalf of Pierre Foods and therefore owed no duty or obligation to N'Genuity as individuals.  The Court will address each argument in turn.

## A.    Personal Jurisdiction

Once a defendant challenges a federal court's personal jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(2), the plaintiff bears the burden of demonstrating that personal jurisdiction exists. *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 800 (9th Cir. 2004). Where, as here, the defendant's motion is based on written materials and not on an evidentiary hearing, "the plaintiff need only make a prima facie showing of jurisdictional facts" from the plaintiff's pleadings and affidavits. *Id.* (quoting *Caruth v. Int'l Psychoanalytical Ass'n*, 59 F.3d 126, 128 (9th Cir. 1995)). Uncontroverted allegations in the complaint must be taken as true, and conflicts between the parties over statements contained in affidavits must be resolved in the plaintiff's favor. *Id.*

Where no federal statute governs the exercise of personal jurisdiction, a federal court generally applies the "long-arm" statute of the state in which it sits. *Omni Capital Int'l, Ltd. v. Rudolf Wolff & Co., Ltd.*, 484 U.S. 97, 104-05 (1987). In Arizona, the state in which this Court sits, personal jurisdiction is available over a nonresident defendant "to the maximum extent permitted by the Constitution [of Arizona] and the Constitution of the United States." Ariz. R. Civ. P. 4.2(a). These constitutions permit a court to exercise personal jurisdiction if a defendant has "sufficient minimum contacts with the forum state such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Williams v. Lakeview Co.*, 199 Ariz. 1, 3, 13 P.3d 280, 282 (2000) (citing *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 320 (1945)).

Although personal jurisdiction may be "general" or "specific," "the constitutional touchstone remains whether the defendant purposefully established 'minimum contacts' in the forum State." *Id.* (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474 (1985)). Thus, general jurisdiction may be exercised if a nonresident defendant's contacts with the forum state are "substantial or continuous and systematic enough that the defendant may be haled into court in the forum, even for claims unrelated to the defendant's contacts with the forum." *Id.* (citing *Helicopteros Nacionales de Colom., S.A. v. Hall*, 466 U.S. 408, 414 (1984)). Specific jurisdiction, on the other hand, may be exercised if: "(1) the defendant

purposely avails himself of the privilege of conducting business in the forum; (2) the claim arises out of or relates to the defendant's contact with the forum; and (3) the exercise of jurisdiction is reasonable." *Id.* The plaintiff bears the burden of establishing the first two of these prongs; if he does so, then the burden shifts to the defendant to "present a compelling case" that the exercise of jurisdiction is not reasonable. *Schwarzenegger*, 374 F.3d at 802.

A plaintiff can establish the first prong of the specific jurisdiction test by showing either "purposeful availment" or "purposeful direction." *Id.* "Purposeful availment" is most often used in contract suits, and it typically requires "evidence of the defendant's actions in the forum, such as executing or performing a contract there." *Id.* (citing *Hanson v. Denckla*, 357 U.S. 235, 253 (1958)). "Purposeful direction," on the other hand, is most often used in tort suits, and it usually requires "evidence of the defendant's actions outside the forum state that are directed at the forum, such as the distribution in the forum state of goods originating elsewhere." *Id.* at 803 (citing *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 774-75 (1984)). Specifically, "purposeful direction" is to be evaluated under a three-part "effects test" that "requires that the defendant allegedly have (1) committed an intentional act, (2) expressly aimed at the forum state, (3) causing harm that the defendant knows is likely to be suffered in the forum state." *Id.* (citing *Calder v. Jones*, 465 U.S. 783, 788-89 (1984)).

A plaintiff establishes the second prong of the specific jurisdiction test by showing that the plaintiff would not have been injured "but for" the defendant's forum-related contacts. *Panavision Int'l, L.P. v. Toeppen*, 141 F.3d 1316, 1322 (9th Cir. 1998). If a court reaches the third prong, it must weigh seven factors:

> (1) the extent of a defendant's purposeful interjection; (2) the burden on the defendant in defending in the forum; (3) the extent of conflict with the sovereignty of the defendant's state; (4) the forum state's interest in adjudicating the dispute; (5) the most efficient judicial resolution of the controversy; (6) the importance of the forum to the plaintiff's interest in convenient and effective relief; and (7) the existence of an alternative forum.

*Id.* at 1323 (citing *Burger King*, 471 U.S. at 476-77). "No one factor is dispositive; a court must balance all seven." *Id.*

Here, N'Genuity asserts that the Court has specific jurisdiction over the Individual Defendants, and the Complaint describes no conduct by the Individual Defendants readily susceptible to a purposeful availment analysis. Thus, the Court will determine whether any of the Individual Defendants purposefully directed any of their actions at Arizona. The uncontroverted allegations of the Complaint specific to each of the Individual Defendants are as follows.

Denning is alleged to have engaged in two sets of acts. First, in 2007, Denning "began making statements to the effect that Pierre Foods would go around N'Genuity and market and sell chicken wing products directly to the military." (Dkt. # 1 at 5.) Second, Denning "made numerous false, defamatory, and slanderous statements about N'Genuity . . . in an effort to undermine N'Genuity's ongoing business relationships . . . and to circumvent [Pierre Foods'] contractual obligations to N'Genuity." (*Id.* at 22.) Specifically, Denning is alleged to have stated that "N'Genuity wrongfully refused to place orders with Pierre Foods." (*Id.*)

Woodhams Sr. is alleged to have made two calls to N'Genuity in mid-2007. On a May 25, 2007, conference call with N'Genuity, Woodhams Sr. "personally assured N'Genuity that Pierre Foods would never go around N'Genuity and sell N'Genuity's products directly to the military or any other customers." (*Id.* at 6.) Woodhams Sr. also made another call to N'Genuity around that time, reiterating that Pierre Foods would not circumvent N'Genuity, acknowledging that doing so would violate Pierre Foods' agreements with N'Genuity, and stating that he was "embarrassed" that Pierre Foods had not been "following through on their commitments and obligations." (*Id.*)

Woodhams Jr.'s alleged acts all stem from the negotiations between N'Genuity and Pierre Foods in 2007 and 2008. Specifically, Woodhams Jr. participated in a conference call with N'Genuity in which he "confirmed that Pierre Foods would provide a quality assurance and customer service representative dedicated to representing N'Genuity's interests . . . and committed that N'Genuity could write the job description and provide the specifications and requirements for this representative." (*Id.* at 7.) Woodhams Jr. also reviewed the job

description written by N'Genuity, "agreed that this was an appropriate set of specifications and requirements," and "confirmed that Pierre Foods would provide a representative whose job duties would cover all of the identified specifications and requirements." (*Id.*) Woodhams Jr. was also involved in a conference call with N'Genuity in August 2008 in which he "threatened that if N'Genuity did not immediately sign the current version [of the proposed Supplier Agreement], incorrect and incomplete as it was, Pierre Foods would refuse to fill its existing orders with N'Genuity." (*Id.* at 8.)[2]

The Individual Defendants do not dispute that N'Genuity has alleged that they engaged in intentional acts expressly aimed at N'Genuity's operations in Arizona. The Individual Defendants argue only that their contacts with Arizona were as employees of Pierre Foods, and thus that none of the conduct can be imputed to them as individuals. (Dkt. # 18 at 3-4.) The Individual Defendants seem to be channeling the "fiduciary shield doctrine," under which "a person's mere association with a corporation that causes injury in the forum state is not sufficient in itself to permit that forum to assert jurisdiction over the person." *Davis v. Metro Prod.*, 885 F.2d 515, 520 (9th Cir. 1989) (applying Arizona law).

The Individual Defendants are correct that employees' contacts with a forum state "are not to be judged according to their employer's activities there," and "[e]ach defendant's contacts with the forum State must be assessed individually." *Calder*, 465 U.S. at 790. However, "their status as employees does not somehow insulate them from jurisdiction." *Id.* Where defendants are "primary participants in an alleged wrongdoing intentionally directed at a [forum state] resident, [] jurisdiction over them is proper." *Id.* Thus, as long as the

---

[2]The Complaint's other mentions of Woodhams Jr. do not appear to be tied to any alleged wrongdoing and thus are not relevant. Those other mentions provide that Woodhams Jr. allegedly participated in a conference call with N'Genuity on August 26, 2008, in which he stated that Pierre Foods had roughly 34,000 cases of chicken wing products in inventory, a statement that is not alleged to be false. (Dkt. # 1 at 12.) Also, Woodhams Jr. was included on an email sent by N'Genuity on November 11, 2008, but it was another Pierre Foods employee that responded to the email. (*Id.* at 14.) Additionally, Woodhams Jr. did not respond to N'Genuity's attempts to contact him in November 2008. (*Id.* at 17.)

conduct causing an effect in the forum state is not "general untargeted negligence," but rather is "intentional, allegedly tortious actions by the defendants expressly aimed at the forum state," then the fiduciary shield doctrine will not divest the court of personal jurisdiction. *Davis*, 885 F.2d at 520; *Click v. Dorman Long Tech., Ltd.*, No. C06-1936, 2006 WL 2644889, at *4-5 (N.D. Cal. Sept. 14, 2006) (holding that "in order for fiduciary shield protections to be unavailable to defendants acting on behalf of their employer," plaintiffs "must make a prima facie showing that some theory of liability allows for [the employee's] contacts, which were conducted on [the employer's] behalf, to be imputed to [the employee] in his personal capacity," such as by alleging "intentionally targeted activity by [the employee] toward a [forum-state] resident" or "that [the employee] expressly aimed his conduct at a [forum-state] resident").

Here, each of the Individual Defendants is alleged to have engaged in intentional tortious conduct targeted at harming N'Genuity in Arizona. Denning's alleged defamatory statements about N'Genuity, for instance, clearly present an allegation of intentional tortious conduct designed to harm N'Genuity. Woodhams Sr.'s calls to N'Genuity, promising that Pierre Foods would not seek to market to N'Genuity's prime vendors, were made in the course of reassuring N'Genuity about Pierre Foods' business after it purchased Zartic assets. This fits under the rubric of N'Genuity's allegations of fraudulent inducement "to continue with its ongoing contractual relationship and business activities with Pierre Foods." (Dkt. # 1 at 27.) Likewise, the allegations that Woodhams Jr. promised that Pierre Foods would provide a representative as N'Genuity requested, and that he threatened that Pierre Foods would stop working with N'Genuity if it did not sign a contract in 2008, are part of N'Genuity's claim that Woodhams Jr. fraudulently induced N'Genuity to sign the Supplier Agreement.

These are not allegations of mere negligence untargeted at N'Genuity, but rather are allegations of intentional torts that had the purpose and effect of harming N'Genuity in Arizona. Such allegations are sufficient to establish personal jurisdiction over the Individual Defendants. *See Dole Food Co., Inc. v. Watts*, 303 F.3d 1104, 1111-12 (9th Cir. 2002)

(finding personal jurisdiction where two foreign employees were "alleged to have communicated with Dole managers in California with the specific intent to cause injury to Dole U.S. by means of those very communications" by attempting to "induce them to implement a new importing system, and, as a consequence, to enter into significant and detrimental contractual arrangements"); *compare Davis*, 885 F.2d at 522-53 (finding that an Arizona district court had personal jurisdiction over officers of a California company that communicated with an Arizona resident to discuss investment in the company because the officers acted with tortious intent to fraudulently induce the Arizona resident to find investors), *with Click*, 2006 WL 2644889, at *3-5 (finding that a foreign employee's communications with the California plaintiff's employer were insufficient to create personal jurisdiction in California because the allegations of tortious conduct were of mere negligence not specifically targeted at the defendants).

There does not appear to be significant disagreement that, if the Individual Defendants did "purposefully direct" their intentionally tortious conduct at N'Genuity, knowing that the harm would be felt in Arizona, then the claims against the Individual Defendants would arise out of or relate to each Defendant's contacts with the forum. (*See* Dkt. # 18 at 4.) The Court agrees that N'Genuity would not have suffered the alleged harm "but for" the Individual Defendants' contacts, *Panavision*, 141 F.3d at 1322, and thus the second prong of the specific jurisdiction test is met, *see Dole*, 303 F.3d at 1114 ("It is obvious that Dole's claims against Watts and Boenneken arise directly out of their contacts with the forum. As recounted above, the contacts between Watts and Boenneken and the forum state are integral and essential parts of the alleged fraudulent scheme on which Dole bases its suit.").

Likewise, the Individual Defendants do not seriously dispute that the exercise of jurisdiction is reasonable, other than to argue that it is unreasonable in the absence of "purposeful direction." (*See* Dkt. # 18 at 4.) Nor does the Court, on its own review, "divine any substantial concern" for any of the reasonableness considerations. *Davis*, 885 F.2d at 523. Thus, the Individual Defendants have not rebutted the presumption that the exercise of personal jurisdiction over them is reasonable. *See id.* (finding the exercise of personal

jurisdiction reasonable in the absence of specific argument on the point and in the absence of apparent offense to any of the seven factors).

Because N'Genuity has made a sufficient prima facie showing of specific jurisdiction, and because the Individual Defendants have failed to rebut the presumption that jurisdiction is reasonable, the Court has personal jurisdiction over the Individual Defendants.

### B.     Duty to Plaintiff

Similar to their argument under the personal jurisdiction test, the Individual Defendants argue that they should be dismissed from this action because "[e]ach of the allegations [against them] expressly recognizes that the statements [they made] were being made on behalf of Pierre [Foods]." (Dkt. # 18 at 4-5.) However, the Complaint asserts that Denning, Woodhams Sr., and Woodhams Jr. were individually liable for the asserted intentional torts, not that they were liable simply as corporate employees. As explained above, the fiduciary shield doctrine does not insulate the Individual Defendants from liability if these allegations are true. *See Davis*, 885 F.2d at 521-22. Thus, the Individual Defendants will not be dismissed.

## II.     Pierre Foods

Defendants' next argument is that N'Genuity's claims against Pierre Foods are barred by its bankruptcy reorganization and discharge.[3] (Dkt. # 18 at 5-7.) "[T]he confirmation of a [bankruptcy] plan discharges the debtor from any debt that arose before the date of such confirmation." 11 U.S.C. § 1141(d)(1)(A). "Debt" includes "liability on a claim." 11 U.S.C. § 101(12). Thus, the question of whether N'Genuity's claims against Pierre Foods

---

[3]Defendants also argue that this issue may be decided by the bankruptcy court (Dkt. # 18 at 7), but the parties agree that both courts have jurisdiction. In the interests of judicial economy, and because the matter does not require the particular expertise of the bankruptcy court, this Court will decide the issue.

were discharged depends on whether those claims arose before December 12, 2008, the date on which Pierre Foods' bankruptcy plan was confirmed. (Dkt. # 18 Ex. E.)[4]

"[A] claim arises, for purposes of discharge in bankruptcy, at the time of the events giving rise to the claim, not at the time [the] plaintiff is first able to file suit on the claim." *O'Loghlin v. County of Orange*, 229 F.3d 871, 874 (9th Cir. 2000). Even where post-confirmation events giving rise to a claim are part of the same course of conduct as pre-confirmation events, the continuing nature of any legal violation does not result in the discharge of claims based on events occurring after the confirmation date. *Id.* at 874-75. Therefore, any claims against Pierre Foods based on events occurring prior to December 12, 2008, have been discharged, while claims based on events after that date, even if those events were part of a continuing course of conduct that spanned the confirmation date, are not discharged.

N'Genuity musters several arguments as to why the Court should not adopt December 12, 2008, as the date of discharge. However, these arguments are not persuasive. N'Genuity first argues that its fraud claims did not accrue for the purposes of bankruptcy discharge until the claims accrued as a matter of state law. (Dkt. # 35 at 7-8.) While that may be the case for courts in the Third Circuit, *see Jones v. Chemetron Corp.*, 212 F.3d 199, 206 (3d Cir. 2000), in the Ninth Circuit "a claim arises when a claimant can fairly or reasonably contemplate the claim's existence even if a cause of action has not yet accrued under nonbankruptcy law," *In re SNTL Corp.*, 571 F.3d 826, 839 (9th Cir. 2009). Thus, N'Genuity's arguments about Arizona state law are inapposite.[5]

_____

[4]The Court may take judicial notice of the bankruptcy proceedings. *See In re McGhan*, 288 F.3d 1172, 1180 (9th Cir. 2002).

[5]N'Genuity does not challenge the notion that the Ninth Circuit test is satisfied, but upon its own review the Court agrees that it is. There is no doubt that N'Genuity could have fairly and reasonably contemplated its fraud claims against Pierre Foods before December 12, 2008, for N'Genuity alleges that it stopped ordering from Pierre Foods in November of 2008 based on the very fraudulent activity for which it now claims relief. Of course, to the extent that any of the fraud claims rest on fraudulent events occurring after December 12,

N'Genuity next argues that the bankruptcy plan itself provides that "liability arising under or from post-petition contracts, such as the Supplier Agreement here, was expressly not discharged." (Dkt. # 35 at 8.) N'Genuity bases that argument on the "Contracts and Leases Entered Into After the Commencement Date" section of the reorganization plan, which provides:

> Contracts and leases entered into after the Commencement Date by any Debtor, including any Executory Contracts and Unexpired Leases assumed by such Debtor, will be performed by the Debtor or Reorganized Debtor liable thereunder in the ordinary course of business. Accordingly, such contracts and leases (including any assumed Executory Contracts and Unexpired Leases) will survive and remain unaffected by entry of the Confirmation Order.

(Dkt. # 18 Ex. D at 98.) N'Genuity's reading of this section is untenable. This section provides only that contracts entered into by Pierre Foods after the commencement of bankruptcy proceedings are not terminated or otherwise affected by entry of the confirmation order. This section does not suggest, much less does it "expressly" state, that liability for civil claims that arise after the confirmation date is not discharged. Rather, under the bankruptcy statutes "the confirmation of a [bankruptcy] plan discharges the debtor from *any* debt that arose before the date of such confirmation." 11 U.S.C. § 1141(d)(1)(A) (emphasis added). The reorganization plan does not alter that statutory principle.

N'Genuity's last argument is that the bankruptcy claims were not discharged because "N'Genuity was not given sufficient statutory notice." (Dkt. # 35 at 8.) Specifically, N'Genuity argues that Pierre Foods sent the Notice of Confirmation Hearing and related documents to N'Genuity's old address – although, conspicuously, N'Genuity does not argue that it did not receive the information. (*See id.* at 8-9.) Defendants respond with several arguments, but the Court need not reach them all. Defendants have introduced ample evidence from the bankruptcy records that N'Genuity maintained several addresses, that the relevant notices were mailed to all of those addresses, and that, for each and every mailing,

---

2008, claims for such fraudulent activity were not discharged by the earlier confirmation order.

at least one of the notices was not returned as undeliverable. (Dkt. # 42 Ex. A-M.) Mail directed to an old address is generally presumed to have been forwarded to a new address if it is not returned as undeliverable. *See In re R.H. Macy & Co., Inc.*, 161 B.R. 355, 359-60 (S.D.N.Y. 1993) (rejecting the argument that a party did not receive a bankruptcy notice because the proof of claim package "was not returned as undeliverable" and thus was "presumed to have been forwarded to [the party's] new address"). Here, N'Genuity has offered nothing to rebut the presumption of receipt or even to dispute that it was fully aware of the bankruptcy proceedings. Thus, N'Genuity cannot avoid the discharge date of December 12, 2008.[6]

However, this holding does not require complete dismissal of Pierre Foods from this action. While Defendants identify a number of events in the Complaint that occurred prior to December 12, 2008 (Dkt. # 18 at 6-7), N'Genuity points out that there are other events alleged in the Complaint occurring after December 12, 2008, that could support at least some of N'Genuity's claims (Dkt. # 35 at 7). Specifically, N'Genuity alleges that Pierre Foods solicited N'Genuity's customers and began selling chicken wing products to them after December 12, 2008, without regard to the agreements between N'Genuity and Pierre Foods and the agreements between N'Genuity, prime vendors, and others. As part of doing so, N'Genuity alleges, Pierre Foods acted fraudulently and made false and defamatory statements about N'Genuity to prime vendors and others in order to undermine and co-opt N'Genuity's business relationships. To the extent that, after the confirmation date, Pierre Foods improperly solicited or sold products to vendors, acted fraudulently, or made false and defamatory statements about N'Genuity, claims based on those events remain viable. To the

---

[6]N'Genuity also seems to make an equitable argument, extolling the Court to ignore the discharge statutes because enforcing them would "allow Pierre Foods to exploit the bankruptcy code," and "[t]his Court should not sanction such deliberate conduct." (Dkt. # 35 at 8.) The Court, however, is not at liberty to ignore the bankruptcy statutes, and it will not fail to enforce the discharge entered by the bankruptcy court.

extent that any of N'Genuity's claims are based on events occurring before December 12, 2008, these claims have been discharged and are therefore dismissed.[7]

However, it is appropriate at this point to dismiss N'Genuity's fraudulent inducement claim against Pierre Foods in its entirety. N'Genuity's Complaint states that Defendants "fraudulently induced N'Genuity to enter into the N'Genuity Supplier Agreement and the Confidentiality and Non Disclosure Agreement and to continue with its ongoing contractual relationship and business activities with Pierre Foods." (Dkt. # 1 at 27.) By definition, any events that could have caused N'Genuity to maintain the contractual relationship with Pierre Foods after it acquired Zartic, and later to sign the Supplier Agreement on August 27, 2008, must have occurred prior to December 12, 2008, as N'Genuity itself alleges that it stopped placing orders with Pierre Foods by November 25, 2008. Thus, no inducement could have occurred after that date, and N'Genuity's claim against Pierre Foods for fraudulent inducement must be dismissed.

**III.    Specific Claims[8]**

Defendants advance a host of specific challenges to N'Genuity's claims, many of which challenge the sufficiency of the factual allegations provided in the Complaint. As a general matter, Federal Rule of Civil Procedure 8(a)(2) requires a plaintiff to set forth a "short and plain statement of the claim showing that the [plaintiff] is entitled to relief," in

---

[7]The parties do not make specific arguments about the factual theories underlying each claim, and the scope of the Court's ruling will not exceed the scope of the parties' arguments. Thus, the Court can do no more at this time than hold that N'Genuity's claims against Pierre Foods are dismissed to the extent that they are based on events occurring prior to the confirmation date.

[8]In an apparent attempt to keep their options open as to what the controlling law is, the parties cite sporadically to both Ohio and Arizona law throughout this section. For purposes of this motion, the state law necessary to resolve the parties' arguments is either not relevant, not disputed, or substantially the same in both Arizona and Ohio. However, the Court is not inclined to continue to conduct parallel analyses under both Arizona and Ohio law. Thus, any future motions should actually take a position on what law applies and cite only to that law.

order to "give the defendant fair notice of what the claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).

To survive a dismissal for failure to state a claim, a complaint must contain more than a "formulaic recitation of the elements of a cause of action"; it must contain factual allegations sufficient to "raise the right of relief above the speculative level." *Id.* "The pleading must contain something more . . . than . . . a statement of facts that merely creates a suspicion [of] a legally cognizable right of action." *Id.* (quoting 5 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1216 (3d ed. 2004)). While "a complaint need not contain detailed factual allegations . . . it must plead 'enough facts to state a claim to relief that is plausible on its face.'" *Clemens v. DaimlerChrysler Corp.*, 534 F.3d 1017, 1022 (9th Cir. 2008) (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (citing *Twombly*, 550 U.S. at 556). The plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 555) (internal citations omitted).

When analyzing a complaint for failure to state a claim, "[a]ll allegations of material fact are taken as true and construed in the light most favorable to the non-moving party." *Smith v. Jackson*, 84 F.3d 1213, 1217 (9th Cir. 1996). In addition, the Court must assume that all general allegations "embrace whatever specific facts might be necessary to support them." *Peloza v. Capistrano Unified Sch. Dist.*, 37 F.3d 517, 521 (9th Cir. 1994). Although "a complaint need not contain detailed factual allegations," *Clemens*, 534 F.3d at 1022, the Court will not assume that the plaintiff can prove facts different from those alleged in the complaint, *see Associated Gen. Contractors of Cal. v. Cal. State Council of Carpenters*, 459 U.S. 519, 526 (1983); *Jack Russell Terrier Network of N. Cal. v. Am. Kennel Club, Inc.*, 407

F.3d 1027, 1035 (9th Cir. 2005). Similarly, legal conclusions couched as factual allegations are not given a presumption of truthfulness, and "conclusory allegations of law and unwarranted inferences are not sufficient to defeat a motion to dismiss." *Pareto v. FDIC*, 139 F.3d 696, 699 (9th Cir. 1998).

## A. Claim One

Defendants argue that Claim One (breach of contract) must be dismissed because N'Genuity has failed to sufficiently allege damages. (Dkt. # 18 at 8-9.) However, the Complaint alleges damages in the form of lost profits on sales it has made and will make, the loss of other sales in their entirety, and the disgorgement of profits Pierre Foods has improperly garnered. (Dkt. # 1 at 32.) N'Genuity also alleges that its business reputation has been damaged, that it has suffered consequential damages, and that it is entitled to prejudgment interest on liquidated damages. (*Id.* at 33.) N'Genuity has made extensive factual allegations regarding the business relationship between N'Genuity and Pierre Foods, the asserted obligations between the companies, and how it believes those obligations were violated. These allegations are sufficient to render the notion that N'Genuity has been damaged plausible, and it need do no more to survive a motion to dismiss. *See Forte Capital Partners v. Harris Cramer*, No. C07-01237, 2007 WL 1430052, at *7-8 (N.D. Cal. May 14, 2007) (finding a general averment of damages sufficient to survive a motion to dismiss because the simplified pleading standard of Rule 8 applies to the pleading of damages and because "ultimately [the plaintiff's] damages is a question of fact subject to proof, and is inappropriate to support [the] motion to dismiss"). Thus, Claim One is not deficient in this respect.

Defendants also argue that N'Genuity has not sufficiently alleged a breach because any oral promises it made cannot form the basis of a claim for breach. (Dkt. # 18 at 9-10.) However, it is not clear from the Complaint that the breach of contract claim is premised on unwritten promises. Rather, the Complaint refers to breaches of the Supplier Agreement and the Confidentiality and Nondisclosure Agreement, both of which are alleged to be written

documents (*see* Dkt. # 1 at 9) to which Defendants' arguments are inapplicable. Thus, Claim One need not be dismissed.[9]

**B.    Claim Two**

Defendants argue that Claim Two (breach of the duty of good faith and fair dealing) fails because such a claim cannot be premised on actions preceding any contractual agreement.  (Dkt. # 18 at 11.)  N'Genuity defends this claim only by arguing that its allegations rest on Defendants' conduct after entering the agreements, and not on pre-contract actions.  (Dkt. # 35 at 16-17.)  By conceding that its claims rest solely on post-contract activity, and by failing to defend the claim's viability if predicated upon pre-contract activity, N'Genuity has abandoned the challenged aspect of this claim.  *See Jenkins v. County of Riverside*, 398 F.3d 1093, 1095 n.4 (9th Cir. 2005); *Foster v. City of Fresno*, 392 F. Supp. 2d 1140, 1147 n.7 (E.D. Cal. 2005) (citing *Abogados v. AT&T, Inc.*, 223 F.3d 932, 937 (9th Cir. 2000); *Doe v. Benicia Unified Sch. Dist.*, 206 F. Supp. 2d 1048, 1050 n.1 (E.D. Cal. 2002)).  Claim Two is therefore dismissed to the extent that it is predicated on pre-contract actions, but it remains viable as to any post-contract actions.

**C.    Claims Three, Four, and Five**

Defendants argue that N'Genuity's fraud claims (Claims Three, Four, and Five) are not pled with the requisite degree of particularity.  (Dkt. # 18 at 11-12.)  If a complaint

---

[9]To the extent that the breach of contract claims are predicated on oral agreements, the parties' arguments about those agreements are too fact-intensive to be disposed of on a motion to dismiss.  For instance, Defendants' argument that evidence of oral agreements is prohibited by the parol evidence rule requires the Court to determine whether the Supplier Agreement is "fully integrated," which in turn requires the consideration of extrinsic evidence.  *See Anderson v. Preferred Stock Food Mkts., Inc.*, 175 Ariz. 208, 211, 854 P.2d 1194, 1197 (Ct. App. 1993); *Nat'l City Bank v. Donaldson*, 642 N.E.2d 58, 61 (Ohio Ct. App. 1994).  On a motion to dismiss, however, the Court looks to the pleadings on file, not to extrinsic evidence, unless it converts the motion to dismiss into a motion for summary judgment and provides the opportunity for discovery.  *See Inlandboatmens Union Pac. v. Dutra Group*, 279 F.3d 1075, 1083 (9th Cir. 2002).  The Court will therefore defer ruling on the propriety of this particular theory of breach until there is a sufficient factual record to permit doing so and it is challenged on a motion for summary judgment.

includes allegations of fraud, Federal Rule of Civil Procedure 9(b) requires the "party [to] state with particularity the circumstances constituting fraud." This requires that the party alleging fraud include an account of the "time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentation." *Edwards v. Marin Park, Inc.*, 356 F.3d 1058, 1066 (9th Cir. 2004). "Rule 9(b) does not allow a complaint to merely lump multiple defendants together but require[s] plaintiffs to differentiate their allegations when suing more than one defendant and inform each defendant separately of the allegations surrounding his alleged participation in the fraud." *Swartz v. KPMG LLP*, 476 F.3d 756, 764-65 (9th Cir. 2007) (citation and ellipsis omitted). "To comply with Rule 9(b), allegations of fraud must be specific enough to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done anything wrong." *Bly-Magee v. California*, 236 F.3d 1014, 1019 (9th Cir. 2001) (internal quotations omitted).

Here, all of the allegations of fraudulent conduct are directed against "Defendants" generally and are not differentiated such that each Defendant is apprised of the specific misconduct with which he has been charged. (*See* Dkt. # 1 at 25-27.) This fails the Rule 9(b) test. *See Swartz*, 476 F.3d at 764-65. The fraud claims likewise do not sufficiently plead the "time, place, and specific content of the false representations." *Edwards*, 356 F.3d at 1066. While some dates are provided for certain events that might be construed as fraudulent (such as dates of some conference calls), most of the Complaint simply describes a general course of conduct that could cover any number of fraudulent activities, and the fraud claims themselves provide no specific discussion about what the actual fraud is that N'Genuity is alleging. Rather, the fraud sections simply make general claims for fraud with no specific explanation of what activity was allegedly fraudulent. This is insufficient under Rule 9(b). *See SEC v. Patel*, No. 07-CV-39-SM, 2009 WL 2015794, at *1-2 (D.N.H. July 7, 2009) (explaining that "to reasonably determine that any particular claim should not be dismissed would require the court to first comb the complaint in search of factual support for each element of the multiple claims pled as to each defendant, and then evaluate the

adequacy of that factual support," which "is, of course, plaintiff's job in the first instance, not the court's"). The fraud claims are therefore dismissed.

Because it is not clear that amendment would be futile, this dismissal is without prejudice to the claims' reassertion in an amended complaint. *See Swartz*, 476 F.3d at 761 (explaining that a claim is properly dismissed with prejudice where amendment would be futile). However, if N'Genuity elects to replead its fraud claims, it must plead the "time, place, and specific content" of each misrepresentation as well as "the identities of the parties" involved in each misrepresentation. *Edwards*, 356 F.3d at 1066.

### D. Claims Six and Seven

Defendants argue that Claim Six (interference with existing contractual relationships) and Claim Seven (interference with prospective business relationships) should be dismissed because N'Genuity "does not allege the existence of any actual contract or business relationship that has been subject to interference." (Dkt. # 18 at 13-15.) This argument strains credulity. The Complaint plainly alleges that N'Genuity had ongoing business relationships with prime vendors, and it is these relationships that are the subject of the interference claims. Defendants also seem to suggest that no contractual obligations between Pierre Foods and N'Genuity have been breached, but for the reasons described elsewhere in this order that argument is not persuasive. N'Genuity has alleged that Pierre Foods, through the Individual Defendants, fraudulently insinuated itself into a business relationship with N'Genuity for the purpose of sabotaging and co-opting N'Genuity's relationships with prime vendors. These are sufficient allegations to state claims for interference with existing and prospective business and contractual relationships.

### E. Claim Eight

Defendants argue that Claim Eight (unfair competition) must be dismissed because N'Genuity "never alleges, and cannot allege, that any Defendant violated any agreement to refrain from competition." (Dkt. # 18 at 12.) However, in Arizona "[t]he common law doctrine of unfair competition is based on principles of equity," and thus "[t]he doctrine encompasses several tort theories, such as trademark infringement, false advertising,

'palming off,' and misappropriation." *Fairway Constructors, Inc. v. Ahern*, 193 Ariz. 122, 124, 970 P.2d 954, 956 (Ct. App. 1998). Defendants never attempt to dispute these tort-based theories of unfair competition, which have factual support in the Complaint's allegation that Pierre Foods was attempting to pass off N'Genuity's chicken wing products as its own.

In any event, N'Genuity defends the contract-based theory of unfair competition by arguing that an underlying agreement not to compete is part of both the written Confidentiality and Nondisclosure Agreement and an express oral agreement between the parties. (Dkt. # 35 at 17-18.) To the extent this claim rests on the oral agreement, for the reasons described above in footnote nine the validity of that agreement (and thus this claim) can only be determined in light of an evidentiary record. As for the written Confidentiality and Nondisclosure Agreement, Defendants have made no attempt to rebut N'Genuity's argument that section two of that agreement constitutes a covenant not to compete using N'Genuity's products. (*See id.* at 14, 17.) That section provides that neither party would make use of any confidential information given by the other party without consent. (Dkt. # 35 Ex. 3 at 1 ("The parties agree that neither Party, its agents, employees nor representatives, will use the Confidential Information of the other Party except as agreed upon in writing by the Parties.").) In the absence of any argument to the contrary, the Court finds that this section could be read as an agreement not to compete using confidential information. Thus, N'Genuity has sufficiently stated a claim for unfair competition at this stage in the litigation.

### F. Claims Nine and Ten

Defendants argue that Claim Nine (defamation) and Claim Ten (trade libel and slander) are not pled with particularity. (Dkt. # 18 at 13.) However, Defendants provide no persuasive authority that defamation, libel, and slander claims are required to be pled with particularity. The Federal Rules of Civil Procedure do not include these claims among the list of allegations that must be pled with particularity, and "[a] requirement of greater specificity for [pleading] particular claims is a result that must be obtained by the process of amending the Federal Rules, and not by judicial interpretation." *Swierkiewicz v. Sorema*

*N.A.*, 534 U.S. 506, 515 (2002); *see Galbraith v. County of Santa Clara*, 307 F.3d 1119, 1125 (9th Cir. 2002) ("[N]early all of the circuits have now disapproved any heightened pleading standard in cases other than those governed by Rule 9(b).").

The case upon which Defendants' argument to the contrary relies, *Athans v. Starbucks Coffee Co.*, No. CV-06-1841, 2007 WL 899130, at *1-2 (D. Ariz. Mar. 23, 2007), is readily distinguishable. In *Athans*, the district court had dismissed a pro se plaintiff's complaint because of "a complete lack of factual detail and any articulated legal basis for Defendant's alleged liability." *Id.* at *1. In dismissing the complaint's purported defamation claim, the court instructed the plaintiff to "identify what was said or written, by whom, when, and how [the plaintiff] was injured" if the plaintiff chose to file an amended complaint. *Id.* at *2. The plaintiff did file an amended complaint, but its allegations were "still so vague and conclusory that they fail[ed] to provide [the defendant] with fair notice of the claim against it." *Id.* Therefore, the court dismissed the amended complaint. *Id.*

Contrary to Defendants' reading of the case, the court did not dismiss the defamation claim because it was not pled with particularity. In fact, the *Athans* court explicitly "recognize[d] that this claim is governed by the notice pleading standards of Rule 8, not the more demanding standards of Rule 9." *Id.* The court's initial order was meant simply to instruct a pro se plaintiff on the type of factual detail that would enable him to meet the pleading requirements and was not announcing a broader requirement that the "who, what, when, where, and how" of every specific defamatory statement be set out in a complaint. The court's ultimate dismissal, likewise, was predicated upon a failure to provide more than "vague and conclusory" allegations, not upon a failure to plead defamation with particularity.

Here, the defamation claims are adequately pled. The Complaint alleges that during the course of its business relationship with N'Genuity, Pierre Foods and Defendant Denning repeatedly told prime vendors and ACES that N'Genuity wrongfully refused to place orders with Pierre Foods, placing it in an untenable business position, when Pierre Foods knew that this was untrue. (Dkt. # 1 at 22-24.) N'Genuity explains at length why it believes it had every right to stop placing orders with Pierre Foods (*id.* at 14-17), and further explains how

it was damaged (*id.* at 24). Accompanied by the factual background provided above, these are sufficient allegations to state claims for defamation, libel, and slander. Claims Nine and Ten will therefore not be dismissed.[10]

### G. Claim Eleven

Defendants argue that Claim Eleven (misappropriation of trade secrets and proprietary information) should be dismissed because N'Genuity provides insufficient detail about what the trade secret is and how it was misappropriated. (Dkt. # 18 at 15-16.) This argument is unpersuasive. The Complaint provides that the unauthorized misappropriation of N'Genuity's trade secrets and proprietary information is "Pierre Foods' unauthorized sale of N'Genuity's product," that being the chicken wing products at the center of this litigation. (Dkt. # 1 at 21.) While the Complaint does not explicitly say that "the trade secret is the chicken wing product," that is the clear implication of the Complaint given N'Genuity's allegation that it has "specially developed [the] chicken wing product, with N'Genuity's formula and specifications for taste, quality, and safety." (*Id.* at 4.) Defendants have thus been fairly put on notice that the trade secret at issue is the formula for the chicken wing products, which N'Genuity alleges was misappropriated through overproduction and unauthorized sales in violation of Pierre Foods' agreements with N'Genuity. Defendants' argument that N'Genuity "know[s] this is not the case," and that the recipe actually belongs to Pierre Foods (Dkt. # 42 at 16), is unavailing. On a motion to dismiss, the Court must accept the allegations in the Complaint as true and construe them in the light most favorable to N'Genuity. *Smith*, 84 F.3d at 1217. The Complaint alleges that the formula and

---

[10]It is clear from the Complaint, however, that only Pierre Foods and Denning are alleged to be liable on these claims. (*See* Dkt. # 1 at 22-24 (alleging only that "Pierre Foods and its employee and representative Tim Denning have made numerous false, defamatory, and slanderous statements about N'Genuity").) Thus, Claims Nine and Ten are dismissed to the extent that they are asserted against Defendants Woodhams Sr. and Jr. It is not clear, however, that N'Genuity could not amend its Complaint to add these Defendants, and thus the dismissal is without prejudice. *See Swartz*, 476 F.3d at 761.

specifications for the chicken wing products belong to N'Genuity. (Dkt. # 1 at 4.) Thus, Claim Eleven need not be dismissed.

### H.    Claim Twelve

Defendants' last argument is that N'Genuity cannot seek a declaratory judgment (Claim Twelve). (Dkt. # 18 at 16-17.) Defendants first argue that this claim should be dismissed because N'Genuity is also seeking money damages. However, the mere fact that N'Genuity is seeking monetary damages does not mean that it cannot seek a declaratory judgment. "[W]hen other claims are joined with an action for declaratory relief (e.g., bad faith, breach of contract, breach of fiduciary duty, rescission, or claims for other monetary relief), the district court should not, as a general rule, remand or decline to entertain the claim for declaratory relief." *United Nat'l Ins. Co. v. R&D Latex Corp.*, 242 F.3d 1102, 1112 (9th Cir. 2001) (quoting *Gov't Employees Ins. Co. v. Dizol*, 133 F.3d 1220, 1225 (9th Cir. 1998)). Defendants have not provided the Court any reason to depart from this general rule.

The declaratory claim in this case is not coextensive with the other claims, and thus N'Genuity has not "sought coercive relief on the issue," as Defendants argue. Rather, N'Genuity requests a declaration that it performed all of its obligations under its contracts, that it did not breach or violate any obligations or duties to Pierre Foods, and that Pierre Foods is no longer entitled to sell any N'Genuity product. The first two requests are designed to insulate N'Genuity from any counterclaims Pierre Foods may intend to assert, and are not elements of N'Genuity's other claims. The third request is designed to stop any future sales of chicken wing products, actions which (since they have not yet occurred) are also not the subject of N'Genuity's other claims.

Defendants also argue, very briefly, that the request for declaratory relief should be dismissed because there are no facts in the Complaint to support a claim that Pierre Foods is prohibited from selling excess chicken wing products. This argument seems to be based on the notion that N'Genuity has not alleged that such sale would violate its contractual obligations. However, N'Genuity has directly alleged that the sale of these products without authorization violates the Confidentiality and Nondisclosure Agreement and other contractual

obligations. (Dkt. # 1 at 21.) Thus, the Court will not dismiss the declaratory claim under this reasoning.

**CONCLUSION**

For the reasons described above:

**IT IS HEREBY ORDERED** that Defendants' Motion to Dismiss (Dkt. # 18) is **GRANTED IN PART** and **DENIED IN PART**.

**IT IS FURTHER ORDERED** that Claim Five (fraudulent inducement) against Pierre Foods is **DISMISSED WITH PREJUDICE**.

**IT IS FURTHER ORDERED** that all claims against Pierre Foods based on events occurring prior to December 12, 2008, are **DISMISSED WITH PREJUDICE**.

**IT IS FURTHER ORDERED** that Claim Two (breach of the duty of good faith and fair dealing) against all Defendants is **DISMISSED WITH PREJUDICE** to the extent that it relies on pre-contract actions.

**IT IS FURTHER ORDERED** that Claim Three (fraudulent misrepresentation) against all Defendants, Claim Four (fraudulent concealment and nondisclosure) against all Defendants, and Claim Five (fraudulent inducement) against the Individual Defendants are **DISMISSED WITHOUT PREJUDICE**.

**IT IS FURTHER ORDERED** that Claim Nine (defamation, libel, and slander) and Claim Ten (trade libel and slander) are **DISMISSED WITHOUT PREJUDICE** to the extent that they are asserted against Defendants Woodhams Sr. and Woodhams Jr.

DATED this 9th day of September, 2009.

_____
G. Murray Snow
United States District Judge